UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO.  H-4:17-cr-00651-1 |
| | § | |
| FREDDY MONTES, | § | |
| | § | |
| Defendant. | § | |
| _____ | § | |

**THE UNITED STATES OF AMERICA'S ("UNITED STATES") RESPONSE IN
OPPOSITION TO DEFENDANT'S MOTION TO WITHDRAW HIS GUILTY PLEA
PURSUANT TO FED. R. CRIM. P. 11(d)(2)(B)**

## I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendant filed a motion to withdraw his plea of guilty which contains demonstrably false allegations against undersigned counsel.

Regarding the motion itself, it should be rejected as it only contains conclusory allegations, which, in any event, are meritless.  More specifically, all seven factors articulated in *United States v. Carr,* 740 F.2d 339, 343044 (5th Cir. 1984) weigh heavily against granting Defendant relief.  This includes that the purported facts Defendant challenges in his alleged claim of actual innocence do not affect his admission to the required elements of the two counts to which he pled guilty.  Furthermore, the United States would be extremely prejudiced and the Court would be substantially inconvenienced and its resources would be extremely wasted by granting the motion.  Also, the extent of the delay is huge even when considering it based on the date of filing of Defendant's *pro se* motion seeking similar relief, which was stricken by the Court the day after it was filed.

1

Defendant also has had counsel throughout these proceedings. Moreover, the claim that Defendant's plea was somehow not knowingly, intelligently or voluntarily made is belied by the plea allocution. Indeed, Defendant's heavy amount of interaction with the Court during that allocation, and his making of numerous corrections to matters referred to in that allocution, belie any claim that he was not cognizant of what was occurring.

Regarding Defendant's claims against undersigned counsel, the should not only be rejected, but the Court should sanction defense counsel, who has already been removed from the CJA Panel, for making such allegations because: (1) they are a pattern of a continuing course of conduct in which two other Judges of this Court have already found defense counsel's similar claims to be untrue; (2) the are barred by Rule 3.08(a) of the Texas Disciplinary Rules of Professional Conduct (which defense counsel has previously been informed of in one of those prior cases); (3) defense counsel's purported claim regarding the sentence being sought would be legally and factually impossible; (4) defense counsel's claims are internally contradictory; and (5) the basis of the undersigned counsel's alleged motivation in defense counsel's fictitious claim (striking the *pro se* motion) had already been ruled upon by the Court.

Nevertheless, due to the claim, the United States, in the instant filing, will also address the basis of the Defendant's *pro se* motion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Defense Counsel's Conduct in *United States v. Henry Gonzalez*

On October 27, 2017, sentencing was held in *United States v. Henry Gonzalez,* No. 4:15-cr-00203-14, before the Honorable Melinda Harmon in which the defense counsel

was the same as defense counsel in the present case. *See* Exhibit 1 at 1. That defendant (Gonzalez) pled guilty to possession with the intent to distribute 100 kilograms or more of marijuana (21 U.S.C. § 841(a)(1)/(b)(1)(B) and 18 U.S.C. § 2). *Id.* at 4. Defense counsel objected to Gonzalez not receiving a reduction in his guideline sentence offense level for a minimal role by claiming that he only acted as a lookout for drug transactions 3-4 times and never stated that engaged in more drug transactions during his debriefing with the United States. *Id.* at 7. Defense counsel further claimed that because Gonzalez only acted as a lookout in 3-4, he cannot get an enhancement for being involved in transactions with an aggregate weight of over 1,000 kilograms because each transaction only involved 231 kilograms. *See id.* Defense counsel lastly claimed that Gonzalez should receiving a reduction in his sentence in accordance with the safety valve provision because he was completely honest when debriefing with the United States. Based on her objections, defense counsel claimed that the offense level should be 24. In response, the Assistant United States Attorney ("AUSA") stated that Gonzalez stated during the debriefing that he was involved in 11-12 transactions, that he was more than mere lookout, and that he was not entirely truthful vis-à-vis application of safety valve provision. The AUSA further stated that the resulting offense level should therefore be 30.

In response to the contention that Mr. Gonzales stated during the debrief that he was a lookout 11-12 times, defense counsel stated "**He never said that, Judge. I was there. I sat in that debrief, and I heard what he said**." *Id.* at 8 (emphasis added).

Because of these disputes, two of the agents present at the debriefing were called as witnesses. The first agent stated, in pertinent part, that at the debrief on November 13,

2015, in which the defense counsel, Rodriguez, the AUSA, and two agents (including himself) were present, Rodriguez stated he as a scout ten to eleven times. *Id.* at 38. In response, the following occurred:

> DEFENSE COUNSEL:     I was in the room there, wasn't I?
> AGENT RODRIGUEZ:     Yes, ma'am.
> DEFENSE COUNSEL:     And I heard what my client said, didn't I? . . . Would you agree with that? It's a yes or no question.
> AGENT RODRIGUEZ:     You were on your phone so I don't know what you were –
> DEFENSE COUNSEL:     I was what?
> AUSA:     Your Honor, I object. Not sure it's appropriate. The agent cannot testify as to what Ms. Pastorini recalls or what was in her head.
> THE COURT:     Sustained
> DEFENSE COUNSEL:     My question is: I was there, and I heard what was – what was said in that room. And isn't that correct?
> AGENT RODRIGUEZ:     I can't testify to what you hear.
> DEFENSE COUNSEL:     Okay. No. But you – if I can hear, and I can –
> AGENT RODRIGUEZ:     Uh-huh.
> DEFENSE COUNSEL:     Because you and I are communicating. You know that, right?
> AGENT RODRIGUEZ:     Okay.
> DEFENSE COUNSEL:     So if I – and if I was there, you know what I heard what was said as well, don't you?
> AGENT RODRIGUEZ:     Again, ma'am, I can't testify to what you hear at what point – at what given time.
> DEFENSE COUNSEL:     You do know from the representations I have made to this honorable court that I heard my client sat that he had – he had acted as a lookout, three time – four times – three times – four times, three of which he was paid for. Did you remember me saying that just a few minutes ago?
> AUSA:     Your Honor, objection to the relevant, and this is not appropriate. Counsel can make her arguments. She is making herself a witness. I don't know if that's –
> DEFENSE COUNSEL:     I am a witness, Judge. I mean, I didn't have to make myself one. They have made me one.
> AUSA:     The defendant can take the stand and testify what he says to said to agent, but I don't think it's appropriate for counsel to become a witness.
> DEFENSE COUNSEL:     You're – are you – you're not treading on his right to remain silent, are you, Ms. MacDonald?

> AUSA:    For sentencing purposes the burden is on the defendant to convince the Court that he has truthfully and honestly provided the Court, and the only way for him to meet that burden is for him to testify, or produce another witness.  Counsel cannot be a witness.
>
> DEFENSE COUNSEL:    Judge, he – there is no evidence that – including the allegations against my client that he did anything other than act as a lookout on three occasions, three to four occasions, three of which he was paid for.

*Id*. 39-41.

Following the testimony, when the AUSA stated that "[t]he evidence in the record is that the defendant told agents he did it ten to eleven times, defense counsel stated that following:

> **That is not the truth.  I was there, Judge, and I cannot believe that they're trying to present this today**, know that I – not only me, myself, but Son Tran, a person that works for me, was there.  **I know what he said.  I was there.  I took notes, too**. . . .  [T]he can come into court and embellish things that were not said in those debriefings.

*Id*. at 71-72 (emphasis added) .

In response, the Cout ruled that "I don't find that's [the agent's testimony] untruthful." *Id*. at 74.

After the Court's ruling, defense counsel again stated Gonzalez "only did it four times."  In response, the AUSA against reiterated that "there is no evidence in the record about four times, apart from the assertions of counsel." *Id*. at 76.  The Court then found that the appropriate offense level was 30, concluding that over 1,000 kilograms of marijuana (i.e., more than 4 trips) were involved, and sentenced Mr. Gonzales to a sentence within that guideline range. *Id*. at 77.

In sum, defense counsel's claim that she was telling the truth and the agents and

5

AUSA were lying about what Defendant stated in the debrief was rejected. Rather, Judge Harmon found the agents truthful. Thus, it is axiomatic that defense counsel would have had to be untruthful in her representations as to what occurred.

### B. Defense Counsel's Conduct in *United States v. Edward Mahan*

#### 1. The February 19, 2019 Proceeding

On February 19, 2019, sentencing began in *United States v. Edward Mahan,* No. H-4:16-cr-00004-5, before the Honorable Andrew Hanen, in which the defense counsel was the same as defense counsel in the present case. *See* Exhibit 2 at 1. That defendant (Mahan) pled guilty to possession with the intent to distribute 500 grams or more of cocaine (21 U.S.C. § 841(a)(1)/(b)(1)(B) and 18 U.S.C. § 2). *See* Exhibit 3. Defense counsel claimed that Mahan should be afforded a minor participant adjustment to his offense level because "he was involved in one delivery. . . . [M]y client has always maintained he did it one time and one time only." Ex. 2 at 2-3. In response, the AUSA pointed out that prior to Mahan admitted to conducting 2 prior drug deliveries in both a pre-indictment interview and "[d]uring the safety valve debrief, which was under proffer, Mr. Mahan told myself and two agents . . . [that] he had done it twice before." *Id.* at 3, 5. The AUSA further explained that she was not sure why defense counsel objected to the PSR because Mahan was given safety value and "[]what is problematic now is, in support of her objection, she makes factual assertions denying what the defendant told agents, which now puts Defendant is a worse situation because he won't qualify for safety value if the Defendant himself adopts these factual assertions [of defense counsel]." *Id.* at 5. In response, defense counsel stated:

**I was at that meeting and he gave them that information, number one.**

> **Not one word, not one single word, about how many trips he made or how many kilos was brought up in that conversation.** And the reason it wasn't reflected in a July 2017 email that I had with Ms. MacDonald. We disputed that. We disputed that he ever said that. Those agents made a treat to my client that if he didn't cooperate he would regret it. And, Your Honor, now they're saying he's made those other two tips. He made one trip. Only one trip.

*Id*. at 6 (emphasis added).

Defense counsel further stated "we have disputed since day 1, since I first got this information that he ever said that he had made two other trips. He made one trip." *Id*. at 8.

The AUSA then reiterated that "he did tell us about he had done it twice prior to the time he got arrested." *Id.* at 9. Defense counsel responded, "**That is not true. I was there, Judge. I was sitting in that room and I heard every word of it**." *Id.* (emphasis added). This led the AUSA to ask if Mahan himself adopts the assertions by his defense counsel because, if so, the United States cannot no longer move for safety value. *Id*. at 9. Again, defense counsel claimed "[t]here was not one word mentioned about how many tips. And I was there, Judge, **and I would never misrepresent something to the Court. I cherish too much what you do here and I can assure you that never came up**." *Id*. at 9 (emphasis added).

In response, the AUSA said that the agents present at the debriefing could testify, to which defense counsel responded that they would "misprepresent[] the truth of what was said in a meeting. You can ask my client. **He and I were both there**." *Id*. at 10 (emphasis added).

Defense counsel then stated "**And I made notes** of this in a phone conversation."

*Id*. at 11 (emphasis added). The AUSA then disputed that was the agreement and explained to the Court that there was a prior offered that "**expired**" and what was being said by defense counsel was not part of the plea agreement." *Id*. at 11-12. The AUSA then pointed out that:

> [U]nder oath, Judge Harmon asked the Defendant are there any other agreements that are not contained in this written agreement. He said 'No' under oath. She said are there any side agreement or other secret agreements that didn't make its way into the written plea agreement. He said 'No' under oath. Ms. Pastorini was present at the rearraignment. She said nothing. There is nothing in the written plea agreement.

*Id*. at 12.

The AUSA then explained that she provided an email string that contained an expiration date for the plea offer. *Id*. at 13. Defense counsel responded by claiming that the AUSA made that same offer again and claimed that "I don't know what went on in her [the AUSA's] mind, but . . . she reoffers this. . . . But, Judge, nowhere, nowhere has my client ever said that he made more than one trip." *Id*. at 13. The matter was then reset.

### 2. District Court Filings

On March 1, 2019, similar to the instant case, the United States filed an Opposed Motion for Leave to File Government's Notice of Potential Application of Rule 3.08(a) of the Texas Disciplinary Rules of Professional Conduct and a Notice of Potential Application of Rule 3.08(a) of the Texas Disciplinary Rules of Professional Conduct. *See.* Exhibits 4-5. In so doing, the United States explained that should defense counsel wish to offer testimony about the contested matters, the Court would need to determine if the rule applies and, if so, if defense counsel may continue to represent the defendant.

### 3.  The March 5, 2019 Proceeding

A subsequent sentencing was held on March 5, 2019.  Again, the AUSA explained that Mahan debriefed truthfully but now defense counsel is disputing what was said in the court of the debrief.  *See* Ex. 6 at 4-5.  The AUSA further explained that the new claims by defense counsel about how many prior trips the defendant made affects relevant conduct, acceptance of responsibility, and safety value.  *Id.* at 5-7.  The AUSA stated that if Mahan's position at sentencing is that he only made one trip, he should not get acceptance or safety valve.  *Id.* at 7.

In response, defense counsel stated that Mahan stated he only made one trip and:

> That meeting [the debrief] took place in my presence, Judge.  I was there. Not one word was ever uttered – and for good reason – by either the Government or by those agents as to how many trips.  Because that – as you can see in those emails between Ms. MacDonald and I, that was a real bone of contention.  They – if they wanted this plea to go through and they wanted to find out who sent him, then they would have to – then that was not going to be brought up. . . .  [W]hen we walked out of that meeting, he and I were so happy about the fact that they did not bring that up because my client wasn't going to lie.  He has made one trip and one trip only to Houston to pick up these drugs.  What those agents did to threaten him and try to get him to set up the person that sent him is – is a complete farce.  And your Honor, I was there for the entire debriefing.  It took about 20 minutes.  There was nothing brought up except what – what caused him to do it.. . . .  It was never bourhg tup; **and I can tell you that after 42 years of honorable practice, Judge, I have never misrepresented something like that to the Court;** but I was privy to that conversation.  And that is a – to try to take away his safety vale after he complied and told them about the person who sent him . . . is – its' just unbelievable that they would try to do that. . . .  I was a witness to that.  I was privy to that conversation; and there was never anything – she – it was not asked.  It was not responded to.  And when I saw in the PSR they were trying to hold him responsible for four kilograms – . . . . I objected to that because that's not the truth.

*Id.* at 11-13 (emphasis added).

The AUSA then responded by noting that:

> Ms. Pastorini keeps trying to proffer and testify as a witness. She can't be both a lawyer and witness. She can pick one. The Texas Displinary Rules of Professional Conduct, which I provided to the Court notice of in a filing on Friday, provide unless counsel meets one of five exceptions, which I do not believe apply in this case, counsel must be disqualified to represent any Defendant. So either Mr. Mahan needs to take the stand and tell the Court why he said in the safety valve debrief, then the agents will testify . . . and the Court can make a creditability determination or Ms. Pastorini can take the stand and testify about what she claims she heard during that debrief and the agents will testify under oath and the Court can make the call. . . . There was no verbal re-offer of an original offer that expired after my case got better when I picked up a cooperator and got more evidence against him. The Court doesn't have to get into a messy credibility determination because Fifth Circuit caselaw makes it clear that the written agreement is what governs. . . . Also, Judge Harmon questioned the Defendant thoroughly at the time of rearraignment and covered the idea with him of were there any other side agreements or any other promises that were made that are inducing him to plead guilty; and Mr. Mahan said no under oath. And Ms. Pastorini, a very experienced counsel, said nothing about there being any other side agreement or any other agreement to eliminate relevant conduct." .

*Id.* at 15-16.

Defense counsel repeated her claim that Mahan only mentioned one trip and then stated that Mahan trusting the AUSA was his "second biggest mistake," and that report from the debrief claiming that Mahan stated there were 2 prior trips was nothing more than the agents making good on a threat against Mahan for not agreeing to work as a cooperator. *Id.* at 17, 20-22.

The Court then ordered a hearing on the issue. In so doing, the AUSA explained that:

> Counsel was present for the debrief. She repeatedly attempted to proffer testimony concerning a contested and material fact in issue. Should she wish to testify, she must do so as a witness submit to taking the oath and being cross—examined. If that should occur, the rules do not permit her to both be

a lawyer and a witness. And so the Court would have to determne whether there's an exception that applies as to whether she should be disqualified from continuing to present Mr. Mahan for purposes of sentencing.

*Id*. at. 19.

Mahan then testified and claimed that he never made two prior trips, never claimed that he made two prior trips at the earlier meeting with agents, and never claimed that he made two prior trips in his safety valve debriefing. Specifically, he said he answered no when asked about it at the initial meeting. *Id*. at 29, 34-35, 56-57, 59-60. Defense counsel also asked Mahan if one of the agents lied on his offense report about this issue, to which Mahan answered in the affirmative. *Id*. at. 37.

Later, Mahan answered "yes" when asked if he pled guilty before Judge Harmon, that he had a written plea agreement that he signed, that the plea agreement was going over under oath at the time of the re-arraignment, that he stated he understood everything in the written plea agreement, that he had reviewed it with his attorney, that he understood everything that was contained in the plea agreement, that the Judge asked if there was any other agreements with the Government or the AUSA, and that he told her there were no other agreement other than what was in the written plea agreement. *Id*. at 47-48. Mahan also said he did not think that there was another agreement not in the written plea agreement. *Id*. at. 48. Mahan also acknowledged that a safety valve debrief took place. *Id*. at 50-51.

The agents at the debrief then testified. The first agent testified that, at their first meeting and at the debrief, Mahan admitted to the two prior drug transactions he engaged in in January and February of 2015. *Id*. at 69. The second agent similarly testified that

Mahan stated he made two prior trips and he took notes to that effect from the debrief.  *Id.* at 114-15.  On cross examination, defense counsel stated, "**I know they lied because I was at that – at that – at that safety valve debriefing**.  He did not ever mention nor was he ever asked about the number of trips."  *Id.* at 85 (emphasis added).  In response, the AUSA stated "I object to her proffering as a witness.  The notes, she can question the agent on cross-examination as to when he made them, why he made them.  Because she directly attacked the veracity and credibility of the agents, I think the notes are admissible as extrinsic evidence."  *Id.* at 86.  Then, the Court sustained an objection that defense counsel was testifying.  However, defense counsel then again accused the agent of lying and and stated "I'm a little emotionally involved in this thing because I witnessed some of the things that are not true in this case."  *Id.* at. 103.  Then, during the cross-examination of the second agent, defense counsel stated "But that's – that is – I was there; and you know, I heard what was said and what wasn't said.  You realize that? . . .  But I can assure you I was in that same meeting, and this stuff was never said.  I don't understand why there's – we got two people coming up here saying that it was and that – and that we've got Ms. Macdonald supporting this."  *Id.* at 117.

After all of the testimony, the Court found that Defendant made two prior trips.  *Id.* at 119.

The AUSA then pointed out that because the testimony Mahan gave was untruthful about never telling the agents about two prior trips, he should not get credit for acceptance of responsibility.  *Id.* at. 120-21.  The AUSA also stated that Mahan should receive additional points for obstruction of justice for testifying falsely.  *Id.* at 121.  The AUSA

also stated that he should not receive safety valve credit because he gave untruthful testify and obstructed justice.  *Id*. at 121.

Defense counsel then spoke for approximately fifteen minutes straight.  *Id*. at 122-133.  Defense counsel initially referred to the entire proceeding as a "cat fight that we have over whether or nt there were two other trips."  *Id*. at 123.  Defense counsel then claimed there was no corroboration of those two trips despite the testimony elicited at the hearing.  *Id*. at. 123.  She then referred to the testimony as "scripted" and "unreasonable."  *Id*. at. 123.  Then, defense counsel again stated:

> **In 42 years I've been doing this, I'v never made a representation to a judge in a situation like this where I – where I know not – not the facts of the case because I wasn't there, . . . but I was there at that safety valve meetings and I can assure you from now on without fail my client will – these things will be recorded. . . .**  I certainly accept your original ruling about the fact that you're – you're going to account him for the other two trips; but that doesn't mean – that certain doesn't mean that he lied.  That's not a stamp of having lied.  What it is is you found one – apparently, the evidence more credible on their side than on Mr. Mahan's side and, coincidentally, my side. . . .  **I spent a long time in a prosecutor's office right out of law school; and sinc then, I've been doing general practice, mostly criminal defense work.  Judge, I know things like this happen.  You know it, and I know it, and we hear about it on the television every day.  There are – there are – I don't know how we're going to stop it either.  I don't know how to stop it.  I did everything but throw myself on the floor of this courtroom balling to try to get – you know, beg and plead to get you to believe me.**

*Id*. at 122-127 (emphssis added).

Defense counsel then stated that the offense level should be 24 or 17, and not 28 as argued by the AUSA.  *Id*. at 127, 133-135.

In response, the AUSA stated:

> **Ms. Pastorini's arguments are offensive.  Her core argument is that**

**federal agents took the stand today and lied to your Honor. She claims that . . . a defense attorney who represents a codefendant, conspired with agents to have his client falsely give information in a debrief. . . . . The idea that agents would – and I would conspire to frame Mr. Mahan . . . it's absurd, and it is offensive. And I continue to object again, for the record, to Ms. Pastorini repeatedly trying to proffer evidence and testify as a witness without taking the stand, not being subject to cross-examination, and not being under oath**.

*Id*. at 136 (emphasis added).

In response, defense counsel stated:

As an officer of the Court, I represent to you . . . what I had said as an officer of the Court. . . . He didn't make three trips. . . . He made one trip. . . . I am asking the Court to no – to not be – no be – not be fooled and tricked by all this. . . . My client would have – would have never entered a plea of guilty in this case if there was going to be any – to his knowledge I would ever by any issue about whether he's said two or three trips. He would have never done that. Not on my watch. He would have gone ahead and triedl the motion to suppress. . . . We had a great shot at that; and if she [the AUSA] hadn't contacted me and asked me to enter – to give then the name of the individual and she would limit it to one kilo, essentially, re-offering what she had offered originally, which is – which is in the record, then we would never have done this. And it's just – I'm just shocked and amazed.

*Id*. at 136-137, 140.

The AUSA then, again, asked the Court to make a finding that the agent's were truthful, that she did not breach the plea agreement, that the Defendant was not truthful when he testified, and that he not get credit for acceptance of responsibility." *Id*. at 141.

In response, defense counsel stated:

He did admit truthfully, and I am so – I am so tired of having to defend that; and I apologize, Judge, for blurting it out. But that is – that is an outrageous request, that he testified truthfully. He's not going to get up and lie for those agents to cover their – cover their stories. It was a – it's just a conspiracy of silence is all I can say except in this case it seems to be a conspiracy of talking out loud. My client wasn't going to be a party to it, and it's not – it would have been simpler for him to have gone alone with her – her story, but it's

not the truth.  And the truth matter.  And Judge, I was there. . . .  **You [the AUSA] were there, too; and you know it's the truth Ms. MacDonald**.

*Id.* at 141-42 (emphasis added).

At the conclusion, the Court agreed with the AUSA's guideline determination.  *Id.* at 143.

### 4. Appellate Litigation

These issues were then raised with the United States Court of Appeals for the Fifth Circuit, which rejected Mr. Mahan's contentions.  Similarly, certiorari was denied by the Supreme Court.  *See United States v. Mahan,* 801 Fed. Appx. 292 (5th Cir. 2020), *cert. denied,* --- U.S. ---, 141 S.Ct. 637 (2020).  In its opinion, the Fifth Circuit rejected the claim that the United States breached the plea agreement by violating an unwritten promise to recommend a specific sentencing provision.  The Fifth Circuit explained that the defendant in that case did not show a breach of the plea agreement because the defendant not only failed to provide any details of the alleged unwritten promise, but, more importantly, "the plea agreement and Mahan's assurances to the court at rearraignment do not support the existence of the alleged unwritten promise."  *Id.* at 293.

### C. The Instant Case

### 1. Proceedings Before Defendant's Guilty Plea

On November 7, 2017, Defendant, as part of a twenty-three person indictment, was charged with one count of Conspiracy to Engage in Sex Trafficking by Means of Force, Threats Fraud and Coercion (18 U.S.C. § 1594(c)), two counts of Sex Trafficking by Means of Force, Threats, Fraud, or Coercion (18 U.S.C. §§ 1591(a) and 2), one count of

Conspiracy to Conduct Transportation to Engage in Prostitution (18 U.S.C. §§ 371/2421(a)), two counts of Transporation to Enage in Prostitution (18 U.S.C. §§ 2421(a) and 2), one count of Conspiracy to Entice and Coerce Another to Travel in Interstate or Foreign Commerce for Prostitution (18 U.S.C. §§ 371/2422(a)), two counts of Enticing and Coercing Another to Travel in Interstate or Foreign Commerce for Prostitution (18 U.S.C. §§ 2422(a) and 2), one count of Conspiracy to Import Aliens for Immoral Purposes (18 U.S.C. § 371/8 U.S.C. § 1328), two counts of Importation of Alien for Immoral Purposes (8 U.S.C. § 1328 and 18 U.S.C. § 2), one counts of Possession with the Intent to Distribute Heroin (21 U.S.C. § 841(a)(1)/(b)(1)(C)), and one count of Possession with the Intent to Distribute at Least 50 Grams of Methamphetamine (21 U.S.C. § 841(a)(1)(b)(1)(A)(viii)).  *See* Doc. 1.

The case has been subject to a Protective Order which, in pertinent part, barred defendants from obtaining copies of a large amount of discoverable information regarding the victims in this case.  *See* Doc. 759.

On December 21, 2017, Defendant was arrested for the aforementioned offenses after being apprehended in Mexico.  *See* Docs. 206, 229.

On October 18, 2021, co-defendant Maria Angelica Moreno-Reyna, while represented by counsel, filed a *pro se* motion for hardship credit for hard time served.  *See* Doc. 525.

On August 3, 2022, undersigned counsel responded in opposition to the abovementioned motion by arguing, in part, that because the codefendant had counsel, she cannot file such a *pro se* motion and is not entitled to hybrid representation.  *See* Doc. 596.

Undersigned counsel provided two pages of argument containing citations to two Supreme Court cases, twelve Fifth Circuit Court of Appeals cases, and two District Court cases within the Fifth Circuit in support of this proposition.

On August 29, 2022, this Court denied the abovementioned motion by holding, in pertinent part, that "a criminal defendant represented by counsel may not make *pro se* filings." Doc. 606 at 1 (citing *United States v. Jones,* 842 Fed. Appx. 878, 883 (5th Cir. 2021), citing *Myers v. Johnson*, 76 F.3d 1330, 1335 (5th Cir. 1996)).

### 2. Defendant's Guilty Plea

On August 2, 2022, at the re-arraignment before this Court, undersigned counsel, Defendant, and defense counsel were all present. *See* Exhibit 7 at 4. Defendant was then sworn. *Id.* at 5. Defendant stated that he understood that he was under oath to tell the truth and that if he answers any questions fasely, he could be prosecuted. Tr. at 5. Defendant also stated that if he did not understand a question, he can ask to have it repeated and that if he wanted to ask his attorney a question privately, he could do so at any time. *See id.*

At the beginning of the proceeding, undersigned counsel also noted that Defendant himself found errors in the Sentence Data Sheet in that one of the victims identified therein was inapplicable to the facts Defendant would be admitting to in the plea allocution. *Id*. at 9-10. Additionally, as noted in a subsequent filing, Defendant brought to undersigned counsel's attention a decision by the United States Court of Appeals for the Ninth Circuit that he believed would affect the Sentencing Guideline calculation for one of the two counts of conviction to which he would be pleading. In any event, the Court then inquired of defense counsel if she was ready to proceed and she answered in the affirmative and added

17

"[t]here is nothing other than what **Mr. Goldman has been kind enough to express**." *Id.* at 10 (emphasis added).   In other words, defense counsel noted on the record that undersigned counsel had placed on the record any additional discussions between the parties.

Defendant then indicated that he was a thirty-six year old native born United States citizen who graduated from UTI, which is a trade school in Houston, Texas. *Id.* at 11. *See* https://www.uti.edu/locations/texas/houston?utm_source=google&utm_medium=organic _search&utm_term=google_business_profile.

Defendant then indicated he has never been treated for a mental illness or psychological problem, and was not currently addicted to drugs or alcohol, although he had, in the past been addicted to marijuana before being incarcerated, which would have been more than 5 years prior to the re-arraignment. *Id.* at 11-12.  Defendant then stated he was not under the influence of any drug or medication, was not sick, had enough time to fully discuss the case and charges with his attorney, was satisfied with the advice and help his attorney provided, and did not need to get further legal advice from her or ask her any more questions before proceeding.  *Id.* at 12.  Defense counsel then stated that she had enough time to investigate the law and facts of the case, was confident that Defendant understood the nature of the charges and possible punishments, and believed he was fully confident to enter a plea of guilty and proceed.  *Id.* at 13.  Based thereon, the Court made a finding that Defendant was competent, wished to enter a guilty plea, and was so doing knowingly, voluntarily, intelligently, and with the advice of counsel.  *Id.* at 13.

Defendant then indicated he understood that he had the right to plead not guilty, and

that, if he chose to do so, he would have a right to a jury trial in which twelve United States citizens would have to render a unanimous verdict. *Id*. at 14. Defendant also understood that he would be presumed innocent and that the United States would have to prove his guilt beyond a reasonable doubt. *Id*. at 14. Defendant also indicated he had a right to have an attorney represent him at trial and every other stage of the proceeding and that one would be appointed if he could not afford one. *Id*. at 14.

Defendant then indicated that he understood that he had a right to see and hear all witnesses against him, to cross-examine them, and that he had the right to remain silent and to decline to testify. *Id*. at 14. Defendant further indicated that he understood he could voluntarily elect to testify in his own defense and to compel the production of evidence and witnesses in his favor. *Id*. at 14. Defendant also stated he understood that any choice he made to not put on evidence or to testify could not be used against him. *Id*. at 14. Defendant then understood that, by pleading guilty, he would give up all of those trial rights. *Id*. at 15.

Defendant next indicated that he understood that he would waive a number of arguments on appeal including complaining about how the case was investigated, how he was arrested, any delays in his case following his arrest, or how any searches or seizures were conducted, or how any statements taken from him were obtained. *Id*. at 15.

Defendant then indicated that he understood the case would proceed to sentencing if the Court accepted his plea of guilty. *Id*. at 15.

Defense counsel then stated that she fully explained the indictment to Defendant. *Id*. at 15. Defense counsel waived the reading of the indictment and Defendant indicated

19

he received a copy of the indictment and he read it and his attorney explained the charges against him.  *Id*. at 16.

The Court then explained the elements of the two charges to which he would be pleading guilty.  *Id*. at 16-18.  In so doing, the Court corrected the record by explaining that its reference to victim ABP in the Sentence Data Sheet should have been a reference to victim AP.  *Id*. at 17, 25.  Specifically, the Court made sure that Defendant agreed that the victim MAVM had been stricken and Defendant answered in the affirmative.  *Id*. at 26.  Then, the Court mentioned that ABP should be AP, Defendant responded, "Yeah.  I believed it was. . . .  I didn't know if she had changed or – a name or something, added a name in there.  I didn't know but I'mpretty sure that they were speaking of her."  *Id*. at 26.

In any event, Defendant stated that he understood that the Government was claiming that in order to convict him of Count 1, it must prove that:

> [1]  The Defendant and at least one other person agreed to commit the crime of sex trafficking by means of force, threats, fraud, or coercion as charged in the Indictment and as described in elements 4 through 6.  [2] That the Defendant knew of the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.  [3] That at least one of the conspirators, during the existence of the conspiracy, knowingly committed at least one of the overt acts described in the Indictment in order to accomplish some object or purpose of the conspiracy.  [4] That the Defendant or a member of the conspiracy knowingly recruited, enticed, harbored, transported, provided, obtained, and maintained by any means EMR and A[]P.  [5] That the Defendant or a member of the conspiracy committed such act knowing or in reckless disregard of the fact that means of force, threats of force, fraud, coercion, or any combination of such means would be used to cause the person to engage in a commercial sex act.  [6] That the conspirators acts were in or affected interstate or foreign commerce.

*Id*. at 16-17.

Defendant then indicated that he understood that to be convicted of count 29, the

Government claimed it must prove the following to convict him.

> [1] That the Defendant knowingly possessed a controlled substance. [2] That the substance was, in fact, methamphetamine. [3] That the person possessed the substance with the intent to distribute it. [4] That the quantity of the substance was at least 50 grams.

*Id*. at 17-18.

The Court then asked undersigned counsel to summarize the facts that the United States thinks it can prove in this case. In so doing, undersigned counsel stated, in pertinent part:

> In August 2011, EMR, a noncitizen of the United States, was illegally smuggled into the United States to work as a prostitute for a different sex trafficking organization. While working for this other sex trafficking organization, EMR met Eddie -- William, Eddie, Walter, and this Defendant, Freddy Montes. William, Eddie, Walter, and Freddy offered a job as a prostitute at an SWC controlled brothel at 6021 to 23 Dashwood Street, Houston, Texas, 77081, where she would work under Pattie and Eddie. The brothel was primarily supervised on a day-to-day basis by Gabby. EMR agreed. However, after EMR began working there, William used and threatened to use acts of physical violence, including assault, to have EMR work as a prostitute, even on dates and times when she did not want to do so voluntarily. William also used acts and threatened acts of physical violence to have EMR tattoo his name onto her right arm. As a result of these acts and threatened acts of violence, on February 14th, 2012, EMR returned to Mexico to reside with her family. Then, in early March 2012, William came to the residence of EMR and her family in Mexico to make arrangements to smuggle EMR back into the United States, so she could continue to work as a prostitute for the SWC organization. EMR agreed to be smuggled back into the United States to continue working as a prostitute for the SWC organization under Patty because she was afraid that William would harm her and her family based on William's prior conduct and his knowledge of where her, EMR's, family lived in Mexico. Pattie made arrangements for EMR to be smuggled back into the United States, specifically, from Mexico to Houston, Texas, with part of the journey being via tractor trailer. However, on April 24th, 2012, the tractor trailer in which EMR was being transported was intercepted by immigration authorities, and EMR was apprehended. EMR was later released from immigration custody and returned to Houston, Texas, where she once again worked as a prostitute at the brothel operated

by Patty located at . . . 6021-23 Dashwood, Houston, Texas 77081, as well as a brothel operated by Pattie and Eddie at 6363 Skyline Drive, Houston, Texas, 77057. William then instructed EMR to get cosmetic surgery because he believed EMR was not making sufficient money for the organization as a prostitute. During this time, EMR resided with Freddy and William. EMR, residing with Freddy and William, agreed to the cosmetic surgery and returned to work as a prostitute were due to the acts and threatened acts of physical violence by William. Nevertheless, due the amount of acts of threatened -- and threatened acts of physical violence by William, EMR returned to Mexico on a second occasion, again, to reside with her family. However, William then contacted EMR's family in Mexico and requested that EMR return to Houston to work as a prostitute for the organization. Due to the fear from previous acts and threatened acts of violence by William, EMR returned to Houston. Again, Patty assisted EMR in being smuggled back into the United States to work again as a prostitute for the organization in Houston, Texas. Part of this transportation was conducted by Gilbert Garcia, hereinafter known as Gilbert. However, on July 18th, 2013, Gilbert and EMR were apprehended by immigration authorities. EMR was, again, released from immigration custody and returned to Houston, Texas, where she once, again, worked as a prostitute at the brothels operated by Patty and Eddie. When EMR returned, William physically abused her, in part, for her prior departures.

. . .

Beginning in September 2012, AP a non-citizen, met William in Mexico. William offered to smuggle AP into the United States in exchange for $4,500, which William stated AP would pay back by working at a restaurant operated by Pattie. AP agreed to this arrangement. William then made arrangements to smuggle AP into the United States, at which point, she was transported to a stash house in McAllen, Texas operated by Melisa. Once at that stash house in McAllen, Texas, this Defendant, Freddy, provided AP with a cellular telephone and took her to a hotel, where she stayed for approximately three days while this Defendant, Freddy, made arrangements to transport AP to Houston, Texas. Once in Houston, AP met Patty and William at a restaurant where they, Pattie and William, again, informed AP that she would have to work to repay the $4,500 fee for smuggling her into the United States. Patty and William then informed AP that she would not be working in a restaurant, as she had previously been told, to repay the smuggling fee. Instead, they, Pattie and William, informed AP that she would have to work as a prostitute in a brothel operated by Patty in order to repay the smuggling fee. AP worked at the brothel located at 6021-23 Dashwood, Houston, Texas 77081, which at the time was operated by Patty, William, and Ivan, and which was managed on a day-to-day basis by Gabby. While working as a prostitute, Freddy was responsible for ensuring that AP continued to work in that capacity, which he

did by abusing and threatening to abuse her while they lived together and by having . . . her tattoo his initials on her body. Freddy also informed AP that her debt amount was increased when he obtained a loan to purchase a truck. In addition, in the summer of 2013, Freddy physically assaulted AP while he was driving, and AP was in the passenger's seat. In so doing, Freddy lost control of his vehicle and crashed. Furthermore, Freddy instructed AP, while she was menstruating, to . . . insert tissues into her vagina, so that she could continue to perform sexual intercourse as a prostitute. Additionally, AP needed to visit a medical clinic in December of 2012 and January 2013 as a result of sexually transmitted diseases she caught while working as a prostitute.

. . .

On or about September 12th, 2016, a confidential source, hereinafter known as a CS, along with an undercover agent, hereinafter known as a UC, met with this Defendant, Freddy, in the vicinity of 6021-23 Dashwood, Houston, Texas 77081. Initially, they were to meet at a nearby Mambos restaurant, but Freddy wanted the confidential source and undercover to meet him within the above-mentioned apartment complex because, according to Freddy, there were a lot of 5- 0, which is slang for police in the area. The UC and CS arrived at that location via automobile at approximately 8:00 o'clock p.m. Then at 8:05 p.m., and again, at 8:16 p.m., the CS exited the automobile and had a telephonic conversation with this Defendant, Freddy. At approximately 8:16 p.m., Freddy exited from the apartment complex and met with the UC and CS. Freddy conversed with them and then reentered the apartment complex at 8:18 p.m. Then, at 8:20 p.m., Freddy returned to the parking lot and entered the CS and UC's automobile with the CS and UC. Freddy handed the CS approximately three ounces of a dark, gooey substance which later tested positive as black tar heroin. The CS paid Freddy, this Defendant, $3,000 for the heroin. Afterwards, at approximately 8:22 p.m., Freddy exited the CS and UC's vehicle, returned to the apartment complex, and the transaction was concluded. On December 2nd, 2016, the CS and UC, again, met with this Defendant, Freddy, at the above-mentioned apartment complex and ordered or purchased approximately one pound of methamphetamine from Freddy. On December 2nd, 2016, at approximately 1:49 p.m., the CS and UC met with Freddy in the rear parking lot of the above-mentioned apartment complex, where Freddy entered the rear passenger's side of the CS and UC's vehicle and began to discuss the pending methamphetamine transaction with the CS and UC. Freddy, this Defendant, stated that he is a gang member and provides guns to all of the gang members that live in the apartment complex where he has lived for 17 years. Freddy also explained that he dislikes distributing heroin because -- that he likes distributing heroin -- my apologies -- because heroin users are nicer than methamphetamine users. After that meeting, the CS and UC left the apartment complex. Then, at 3:02 p.m.,

Freddy called the CS and UC and said that he would have the drugs on December 5th, 2016. On December 5th, 2016, the CS called Freddy to let him know that he would be at the Carriage Way apartment complex soon. The CS and UC arrived at 1:21 p.m., and at 1:30 p.m., Freddy came down to where the CS and UC were parked and delivered approximately one pound of methamphetamines to the CS and UC in exchange for $9,000. On January 10th, 2017, the Drug Enforcement Administration Southeastern Regional Laboratory tested the methamphetamine and found it to be 96 percent pure. All of the conversations referred to herein between Freddy and the CS or UC were recorded.

. . .

**Lastly, Your Honor, are real properties. Freddy, this Defendant, admits that he and Pattie used proceeds from the above-mentioned conspiracy to engage in sex trafficking in order to buy real properties in the Houston, Texas vicinity, including, but not limited to, 4016 Woodleigh Street, Houston, Texas 77023**; **7396 Irvington Boulevard, Houston, Texas 77022. . . . This Defendant admits that the following real properties were involved in and used to commit or to facilitate the commission of the sex trafficking conspiracy. This includes the bar at 7396 Irvington Boulevard, Houston, Texas. . . . Also, the house at 4016 Woodleigh Street, Houston, Texas 77023, which was used to house sex trafficking victims**. . . . **In addition to these above-listed real properties in which Freddy and Pattie had an interest**, Freddy is also aware that other properties, including those listed in the Notice of Forfeiture and described in the plea agreement, were also used to facilitate the sex trafficking conspiracy.

*Id*. at 19-32.

Importantly, when asked if there way anything he disagreed with in the abovementioned recitation, Defendant did not simply state no or go silent on the matter. Instead, he asked to speak with his attorney and had undersigned counsel make a clarification. *Id*. at 32. As a result of Defendant paying close attention, undersigned counsel stated "Mr. Montes wants to note – and we have no reason to disagree with this – that he was a juvenile on 4016 Woodleigh Street and 7396 Irving Boulevard [which] were purchased by his mother. . . . And we have no reason to dispute that." *Id*. at 33. The Court then noted that correction and asked Defendant if there were any other clarifications, to

which he answered "No, sir." *Id*. at 34.

Defendant was asked that if there was anything he disagreed with or would want to correct in the abovementioned summary, to which Defendant stated "No." *Id*. at 34. Defendant also answered "Yes" when asked if those facts are true and correct along with the clarification he made." *Id*. at 34. Because Defendant conferred with his counsel after answering that question, the Court brought up the issue again and explained that it needed to be sure that there is a factual basis to support his guilty plea. *Id*. at 35. Defendant indicated he understood. *Id*. at 35. The Court then specified that Defendant did not have knowledge contrary to any of facts recited, to which Defendant answered in the affirmative. *Id*. at 35. The Court then asked Defendant that "As to the acts that the Government's counsel; said that you took, no one forced you to commit those acts . . . As to anything that was said that you personally did." *Id*. at 35. Defendant answered by indicating no one forced him to take those actions that he personally did that were recited in the factual allocution. *Id*. at 36. Defendant then admitted under oath that he did those acts of his own free will. *Id*. at 36. The Court then asked defense counsel if there was anything she believed needed clarification, to which she answered in the negative. *Id*. at 36.

The Court next addressed sentencing. First, it had undersigned counsel review the maximum penalties. *Id*. at 36. Undersigned counsel stated that for court 1, the penalty "is a term of imprisonment of not less thant a term of years of imprisonment, **and not more than life imprisonment**. . . . [F]or count 29 . . . that **isimprisonment of not less than ten years and not more than life imprisonment.**" *Id.* at 37, 39 (emphasis added).

Due to a conference between counsels, at the Court's request, undersigned counsel

noted that the sentence data sheet listed count 5 instead of count 1, but it was corrected. *Id*. at 38.

The Court then asked Defendant if he understood the penalties, and he answered in the affirmative.  *Id*. at 39.  Thus, Defendant admitted that he understood the minimum sentence would be no less than 10 years, i.e., it could not be 8 years.  Defendant also indicated that he knew he faced up to life imprisonment.

Defendant then indicated that he was submect to that full range of punishment by pleading guilty and answered "yes" when asked "knowing that these and other consequences may come with a felony conviction, and knowing the full range of potential penalties, do you still wish to plead guilty."  *Id*. at 39-40.

Defendant then indicated that he understood that the Court decided the sentence and that the Court follows the sentencing guidelines.  *Id*. at 41.  Defendant then indicated that he, his attorney, and undersinged counsel "talked about how the sentencing guidelines might apply to your case, and what sentence you may get.  *Id*. at. 41.  As indicated above, this included a discussion of the Ninth Circuit's decision in *Lin*.   Defendant then answered in the affirmative when asked "if your attorney or Mr. Goldman has also said anything, if you've heard anything about your sentence, or what the sentencing guideline range might be, it is just their estimate or educated guess.  **It's not a promise**.  Your sentence could be different.  Do you understand?"  *Id*. at. 41 (emphasis added).  The Court then explained that it could not determine the sentence range until after the PSR was completed and he and the Government had a chance to challenge the reported facts and the application of the guidelines.  *Id*. at 41.  Defendant indicated he understood that.  *Id*. at 42.  The Court further

noted that the guideline range was not binding on him, but only advisory, to which Defendant indicated he understood. *Id*. at 42. Defendant further stated that he understood that the Court usually sentences within the guidelines, but could depart upwards or downwards. *Id*. at 42. Importantly, Defendant answered "yes" when asked "If you plead guilty, and I accept your plea, that plea is final and binding. **Even if the sentence you receive is more severe than you expect of what your discussed with your attorney, you still can't withdraw your guilty plea and start over. Do you understand**?" *Id.* at 42. Defendant then indicated he understood that if the Court accepts his guilty plea, **he will not know in advance what sentence he is going to get**. *Id*. at. 42-43. Defendant then answered yes when asked "**even though you can't predict the specific penalties and other consequences at this time, do you still wish to plead guilty**." *Id*. at 43.

The Court then asked undersigned counsel about the essential terms of the plea agreement, to which undersigned counsel stated:

> The defendant agrees to plead guilty to Counts 1 and 29 of the Indictment. In exchange, the United States will not oppose the Defendant's request for acceptance of responsibility and will file a motion for a downward departure at the time of sentencing if it determines that the Defendant provided the United States with substantial assistance. The United States will also dismiss the remaining counts against this Defendant at the time of sentence. . . . And the Defendant also waived his right to appeal and to collaterally attack his conviction.

*Id*. at 43-44.

Defense counsel was then asked if those are the terms of the plea agreement reached with the Government and she answered in the affirmative. *Id*. at 44. Defendant then stated that he discussed the plea agreement with his attorney and that everything he agreed to with

the Government and every promise that the Government has made to you [is] set out in writing in the plea agreement." *Id*. at 44-45.  Defendant also stated that he was comfortable that he understood everything in the plea agreement and he answered "**No**" when asked **"has anyone made any promise or assurance to you that is not in the plea agreement."** *Id*. at 45.  Defendant also indicated that he was never threatened in way to persuade him to accept the plea agreement.  *Id*. at 45.  Defendant then indicated that the Court can consider conduct forming the basis of dismissed counts in deciding his sentence, which could make his sentence more severe.  *Id*. at 46.  The Court again asked Defendant "if you elect not to withdraw your guilty plea, your sentence could be more severe than what is in the plea agreement.  Do you understand"  *Id*. at 47.  Defendant answered in the affirmative.  *Id*. The Court then explained that acceptance of responsibility and a motion for a downward departure for substantial assistance  are merely recommendations by the United States and the Court can reject those recommendations without permitting him to withdraw his guilty plea which could lead to a more severe sentence.  *Id*.  Defendant stated he understood that. *Id*. at 48.  Defendant also stated he understood he could not withdraw his guilty plea if the Court did not accept a sentencing recommendation.  *Id*.  Defendant then indicated that he understood he was giving up his right to appeal.  *Id*.

The Court then asked defense counsel if there was any reason why her client should not plead gulty and she stated "No."  *Id*. at 48.

The Court then asked defense counsel if she knew "**of any meritorious defenses that [Defendant] would have to the charges against him**," to which defense counsel stated "**No**."  *Id*. at. 49.  The Court then noted that the sentencing proceeding was longer

28

than normal and that Defendant **"paid close attention."** *Id*. at 49.  Defendant then pled

guilty to counts 1 and 29. *Id.* at 49-50.

Defendant then stated that, under oath, every allegation against him in the

indictment and **everything undersigned counsel said about him was true and correct**

**subject to the corrections**.  *Id*. at 50.  **Defendant also stated that he was making the**

**plea voluntarily and of his own free will**.  *Id*.  **Defendant also stated that no one**

**attempted in any way to force him to plead guilty and no one threatened him** or any

other person to get him to plead guilty.  *Id*.  Defendant also answered "No" when asked

"**has anyone made any promise or assurance of any kind to get you to plead guilty,**

**other than what is in your plea agreement**."  *Id*.  Defendant then stated that he was

pleading guilty of his own free will because he was guilty and for no other reason.  *Id*.

The Court then made the following findings:

The Defendant is fully competent and capable of entering and informed plea.
The Defendant understands the nature of these proceedings and understands
the penalties and consequences for his plea of gulty. The plea is supported by
independent facts establishing each of the essential elements of the offenses
charged by the Government in Counts 1 and 29, and the Defendant intended
to do those acts.  The Defendant has made an informed plea of guilty, and the
plea is voluntary and knowingly made.  Given these findings, **I accept the**
**Defendant's plea of guilty, and the Defendant is now adjudged guilty of**
**the offenses charged by Counts 1 and 29 of the Indictment.**  As to the
written plea agreement, I will defer the decision on whether to accept it until
after the pre-sentence investigation.

*Id*. at 51-52 (emphasis added).

Lastly, the Court stated to Defendant:

You strike me as a bright young man, and I know that part of the plea
agreement that I've just seen, and that we've discussed talks about you
providing substantial assistance and continuing to do so.  That is a good

29

thing.  I urge you to do that to the best of your ability, and that will hopefully
have an impact on what is recommended to me as to the potential sentence
in your case.

*Id*. at 54.

The signed plea agreement was then entered into the Court's Docket.  *See* Doc. 598.

### 3.  Events Following Defendant's Plea of Guilty

On November 2, 2022, three months after he pled guilty, Defendant, while
represented by counsel, filed a *pro se* motion to withdraw his guilty plea in which he
improperly claimed that:  (1) he was arrested on a criminal complaint [even though he was
not], (2) he did not have an opportunity to review all of the discovery including victim
statements [even though he was not allowed to have access pursuant to the Protective
Order], (3) he never committed sex trafficking of minors [even though that was never
alleged], (4) the base offense level of his count of conviction is improper in that it is four
times higher than he anticipated (even though the Court informed him this is not the basis
to withdraw a plea), and (4) he is actually innocent [even though he does not provide a
basis].  *See* Doc. 634.

On November 3, 2022, **the very next day,** the Court struck Defendant's
abovementioned motion on the ground that "[a] defendant may not take action *pro se* while
also under representation by counsel."  Doc. 635.

On December 15, 2022, the Court held an *ex parte* hearing regarding an issue
between Defendant and his counsel.  Importantly, the hearing was set to occur in Courtroom
9F.  *See* Doc. 639.  This is the only hearing in Defendant's case between the date of the re-
arraignment and sentencing.

30

On or about September 9, 2025, defense counsel called undersigned counsel and falsely claimed that undersigned counsel promised in person in court to make a sentencing recommendation of 12 years or imprisonment and she (defense counsel) would make a sentencing recommendation of 8 years or imprisonment and she had a note so reflecting because her notes stated, in sum and substance, "Adam – 12."[1]  Similar to the claims made herein, undersigned counsel responded that this claim was absolutely false, no such promise was ever made, and such a record was legally impossible as the sentence she claimed she would seek was less than the statutory mandatory minimum.  Also similar to the claims made herein, undersigned counsel further explained that the transcript of the re-arraignment proceeding established that no such promise was ever made, but rather, that it established that Defendant knew he faced life imprisonment.  Also similar to the claims made herein, undersigned counsel further explained, as stated in a prior filing in this case, that the only discussion between undersigned counsel and Defendant prior to the re-arraignment was correcting the sentence data sheet and addressing Defendant's interpretation of *United States v. Lin,* 841 F.3d 834 (9th Cir. 2016) ("*Lin 1*").[2]

---

[1] Should the Court so request, the Unitd Staes will provide the call record.

[2] As explained in an earlier filing, Defendant believed that, pursuant to *Lin 1,* his offense level was only 14 for his plea to count 1 and it would be reduced to 12 based on his receiving credit for acceptance of responsibility.  Undersigned counsel explained that:  (1) because Defendant also pled guilty to count 29, his mandatory minimum term of imprisonment is 10 years irrespective of the sentence for count 1; (2) Ninth Circuit caselaw does not bind this court; (3) *Lin 1*, which held that a base offense of 34 did not apply to sex trafficking conspiracy counts as opposed to substantive sex trafficking counts, was disagreed with by the Third Circuit in *U.S. v. Sims,* 957 F.3d 362 (3d Cir. 2020), and on remand in *Lin*, the cross section at U.S.S.G. § 2G1.1(c)(1) was applied such that *Lin's*

On November 10, 2025, at the initial Sentencing proceeding in this case, defense counsel repeated her false claim that, in person, in court, undersigned counsel promised Defendant a sentence recommendation of 12 years imprisonment, and that she would recommend a sentence of 8 years imprisonment, and that the Court would then sentence Defendant to 10 years imprisonment.  Defendant specifically claimed that this "promise" by undersigned counsel was made in exchange for Defendant withdrawing his motion to withdraw his guilty plea outside of this Court's prior courtroom on the eighth floor, despite the fact that such a motion was stricken the day after it was filed and the only court appearance between the re-arraignment and sentencing was an *ex parte* hearing set for the Court's Ninth Floor courtroom.  Defense counsel was unable to provide a date when this alleged statement was made but was adamant that it was made in exchange for Defendant withdrawing his motion to withdraw his guilty plea.

On November 20, 2025, Defendant filed a sealed document.  *See* Doc. 1322. Undersigned counsel was never provided a copy of this document.  In any event, a hearing was set by the Court regarding this document for November 24, 2025, and then reset to December 4, 2025.  *See* Docs. 1323-24.  On November 21, 2025, the Court informed defense counsel, undersigned counsel and the probation officer that the hearing regarding the sealed filing was an *ex parte* hearing and only defense counsel needed to present.  *See* Exhibit 8.

On December 17, 2025, defense counsel emailed to undersigned counsel a thirteen-

---

offense level went up into the high 30s.  *See U.S. v. Lin,* 830 Fed. Appx. 523 (9th Cir. 2020*)* *("Lin 2").*

page document entitled Defendant's First Amendment Motion to Withdraw Guilty Plea. *See* Exhibit 9. Moments later, defense counsel filed a sealed document *with attachment**s***. *See* Doc. 1355. On December 22, 2025, undersigned counsel requested a copy of the sealed filing and the attachments. *See* Ex. 10. On December 28, 2025, defense counsel again provided the motion and also provided a proposed order. *See* Ex. 11. On January 28, 2026, defense counsel informed undersigned counsel and the Court that the only exhibit was a "torn piece of paper that I had already offered into evidence at the hearing with three (3) hand-written numbers on it: 12 8 10." *See* Ex. 12. Undersigned counsel has never seen this piece of paper and there is no record of it being placed into evidence at the November 10, 2025 sentencing.

Meanwhile, in January, 2026, Defendant was not renewed as a member of the Court's CJA Panel. *See* https://www.txs.uscourts.gov/sites/txs/files/CJA%20PANEL%20PUBLISHED%20LIST%202026%20updated%201142026.docx.

On February 20, 2026, defense counsel sent an email to the Court and undersigned counsel that was not only in violation of countless local rules of procedure and rules of ethics, but also in direct contravention to her prior filings and the Court's instructions at the plea allocution which Defendant and his counsel stated they understood. *See* Ex. 13. In this email, defense counsel claimed that she filed two motions to withdraw the guilty plea, with the first being filed on November 20, 2025. However, as noted above, the document filed that day was not a motion to withdraw a guilty plea. Defense counsel also re-asserted her false claim that undersigned counsel told him about a 12 year sentencing

recommendation "prior to entering into his plea." Again, at sentencing and in her motion, Defendant claimed that this "12" was referred to following the plea regarding Defendant's stricken *pro se* motion to withdraw his guilty plea. Defense counsel also stated, in direct contravention of the Court's plea allocution, that the pre-sentence investigation report would reflect a 15-year sentencing recommendation, that she would ask for an 8 year sentence (even though the mandatory minimum is 10 years), and that the Court would split the difference and sentence Defendant to 10 years.

## III.    ARGUMENT

### A. Defendant's Motion to Withdraw His Guilty Plea is Meritless

Initially, it is well settled that Fed. R. Crim. P. 11(d)(2)(B) is the applicable rule where, as here, the Court accepts a defendant's guilty plea but defers accepting the plea agreement. *See United States v. Hyde,* 520 U.S. 670, 677 (1997); *United States v. Harrison*, 777 F.3d 227, 234 (5th Cir. 2015); *United States v. Maracalin*, 132 F.3d 1453 (5th Cir. 1997); *United States v. Cessa*, 626 Fed. Appx. 464, 471 (5th Cir. 2015); *United Staes v. Buholtz*, 562 Fed. Appx. 213, 214 (5th Cir. 2014). That rule only allows a defendant to withdraw a guilty plea if he/she "can show a fair and just reason for requesting the withdrawal."

Importantly, a defendant is not entitled to withdraw his/her guilty plea and the burden under Fed. R. Crim P. 11(d)(2) rests with the defendant at all times. *See United States v. Lord,* 915 F.3d 1009, 1014 (5th Cir. 2019).

The Fifth Circuit applies a seven factor test to determine whether the defendant has meet his burden: "(1) whether the defendant asserted his actual innocence; (2) whether

withdrawal would prejudice the [United States]; (3) the extent of the delay, if any, in filing the motion to withdraw; (4) whether withdrawal would substantially inconvenience the Court; (5) whether the defendant had the benefit of close assistance of counsel; (6) whether the guilty plea was knowing and voluntary; and (7) the extent to which withdrawal would waste judicial resources." *Lord,* 915 F.3d at 1014, citing *United States v. Carr*, 740 F.2d 339, 343-44 (5th Cir. 1984).  No single factor or combination of factors mandates a single result, and the determination should be based on the totality of the circumstances.  *See id,* citing *United States v. Powell,* 354 F.3d 362, 370 (5th Cir. 2003).

### 1. Assertion of Innocence

In *Harrison*, the Fifth Circuit Court of Appeals explained that "a defendant's assertion of actual innocence alone, without supporting evidence, is insufficient to warrant allowing withdrawal under *Carr."* 777 F.3d at 235.  Indeed, in *Harrison*, the Fifth Circuit further explained that statements from an codefendant and a witness claiming that a defendant did not participate in the scheme at issue, as well as a sworn affidavit from the defendant himself refuting the facts contained in the allocution, do not satisfy this element because "[o]therwise, the mere assertion of legal innocence would always be a sufficient condition for withdrawal, and withdrawal would effective be an automatic right." *Id.*

Similarly here, although, throughout his motion, Defendant utilizes this term, he provides no actual examples and made no arguments as to why he is actually innocent except to complain about being labelled as an "associate" of the Southwest Cholos. Importantly, however, Defendant never indicates of which of the elements of the two offenses, nor which facts recited in the plea allocution forming the bases of his two counts

of conviction, he is innocent.

By way of contrast, every aspect forming the basis of count 29, was recorded and turned over to defense counsel during discovery. *See* Ex. 14.[3] This includes his recorded statements admitting his association, i.e., that he provides weapons, to gang members. As for count 1, the Court is well aware of all of the co-defendants who have identified Defendant's participation in the sex trafficking of AP and EMR, and the Court also has those victims statements regarding Defendant's conducts.

Moreover, although not forming the basis for a claim of actual innocence, the attached photographs of Defendant with known Southwest Cholos further establishes his association with that organization. *See* Ex. 15. In addition, Defendant is identified throughout the Title III Applications for Wire and Electronic Intercepts as being a member of the Southwest Cholos. *See* Ex. 16.[4] Also, Defendant was listed as the owner in the *lis pendens* of the following properties: 7929 Clinton Road, 8306 La Porte Road, and 8312 La Porte Road.[5] This further belies the claims in his motion (although, again, it does not affect his actual innocence of the crimes charged).

In sum, this factor weighs strongly against withdrawal.

### 2. Prejudice to the United States

The United States would be prejudiced because itwould have to resurrect a case that

---

[3] Due to their size, these records will be submitted under separate cover.

[4] Due to their size, those Applications will be submitted under separate cover.

[5] Although in Defendant's name, the United States elected not to seek forfeiture of those particular properties because more was owed on them than they were worth.

it thought had been resolved and would have to call witnesses, including sex trafficking victims who have since moved and provided victim impact statements with belief that this ordeal has now passed.  The United States would also have to call numerous cooperating co-defendants, many of whom have been sentenced and/or removed from the United States. The United States would also have to call several Drug Enforcement Administration Special Agents, many of whom have retired, about drug transactions that occurred 9 years ago.  Therefore, this factor weighs heavily against withdrawal.

### 3.  Delay in Filing the Motion to Withdraw

"The longer a defendant delays in filing a withdrawal motion, the more substantial reasons he must proffer in support of his motion.  *Carr*, 740 F.2d at 344.  The Fifth Circuit has held that even delays as short as 22 days weigh against the defendant, and has described a six-week delay as "significant."  *Lord,* 915 F.3d at 1015 (collecting cases).  *See also Harrison,* 777 F.3d at 236 (filing withdrawal motion more than five weeks after pleading guilty and then waiting another six weeks to file supporting documentation  weighs against granting the motion); *United States v. Thomas,* 13 F.3d 151, 153 (5th Cir. 1994) ("the six-week delay between entry of the plea and the motion to withdraw is significant").

Here, Defendant's *pro se* motion to withdraw his plea, which was stricken, was filed three months after entry of his plea of guilty.  Moreover, Defendant's actual motion that the Court is now considering was filed more than three years after entry of the plea of guilty.  As a result, this factor too weighs heavily against withdrawal.

### 4.  Substantial Inconvenience to the Court

In *United States v. Jones*, No. 19-72, 2021 WL 1320715 (M.D. La. April 8, 2021),

that Court explained that "when, as here, the district court has already reviewed the PSR and other materials, a motion to withdraw is disruptive to the trial docket and inconveniences the Court." *Id.* at *19, citing *Lord,* 915 F.3d at 1015. *See also United States v. Grant*, 117 F.3d 788, 790 (5th Cir. 1997); *United States v. Adams,* 275 Fed. Appx. 298, 300 (5th Cir. 2008). The Court in *Jones* further explained that this element weighs against granting such a motion when the matter is raised on the morning of sentencing. *Id.* at *19.

While the Court is in the best position to assess its own inconvenience, in addition to the ordinary expense and hassle for calling in a jury for a jury trial (*see United States v. Anderson*, No. 3:19-cr-33, 2021 WL 329896, at *1 (S.D. Miss. Feb. 1, 2021) ("There is no doubt that granting the motion would inconvenience the Court. Preparing for and conducting a jury trial is obviously more time consuming and disruptive to the docket than a single sentencing hearing."); *United States v. Bravo-De La Cruz Morante,* 375 F. Supp. 3d 707, 724 (S.D. Tex. 2019) ("the withdrawal of the guilty plea would result in substantial inconvenience to the court, particularly if a trial is necessary as judicial resources would need to be allocated to arrange for the trial.")), it is noted that, as this is a sex trafficking case, as the Court is well aware, an extra large venire panel will be needed as many jurors in such cases have to be dismissed for cause because they admit that they cannot be fair and impartial due to the subject matter of the offense charged. As a result, this factor also weighs heavily against granting Defendant's motion.

### 5.  Close Assistance of Counsel

This factor has been described as a fact-intensive inquiry that considers whether

38

counsel was available to defendant throughout the proceedings, whether counsel negotiated the defendant's plea agreement, and whether a defendant was satisfied with his defense counsel. *See Lord,* 915 F.3d at 1016. The Court in *Lord* further explained that "whether a defendant has close assistance of counsel does not turn on whether counsel found legal authority to support a viable defense. *Id.* at 1015-16.

The most important basis for this factor weighing against granting the motion is the fact that "at his plea hearing, [Defendant] stated that he was satisfied with the assistance of counsel. *United Staes v. Urias-Marrufo,* 744 F.3d 361, 365 (5th Cir. 2014). As more fully explained by the Court in *Jones,* 2021 WL 1320715, at *13:

> Defendant stated under oath that he was satisfied with [his attorney's] representation and had faith and confidence in him. . . . Further, [the attorney] represented that he was satisfied that Defendant knew what he was charged with; that [the attorney] had a full opportunity to investigate the facts and law as well as any possible defenses and to advise Defendant of those; and that [the attorney] joined Defendant isn his decision to plead guilty. . . . Defendant acknowledged hearing the question asked to [his attorney] and [his attorney's] answers, and specifically said he had no questions, concerns, or comments about the Court's questions or [the attorney's] answers. Again, considering all the facts, Defendant has close assistance of counsel.

*See also Anderson,* 2021 WL 329896, at *2 ("during the plea hearing, [Defendant] confirmed that he was satisfied with the amount of time he had to spend with his attorney, with the amount of time his attorney spent on his case, and with the counsel, representation, and advise given to him in the case by his attorney."); *Bravos-De La Cruz Morante*, 375 F. Supp. 3d at 724 (Defendant concedes that he has been well represented by counsel throught his proceedings.").

Here, the record establishes that Defendant has had counsel since his initial

appearance.  The plea colloquy also establishes that Defendant stated, under oath, that he was satisfied with his defense counsel, and indeed, after two sealed hearings on the matter, Defendant elected to proceed with his current counsel.  Indeed, it is Defendant's counsel that has filed the instant motion.

It is also noteworthy that Defendant's counsel negotiated a plea bargain that contained the possibility of a motion pursuant to U.S.S.G. § 5K1.1.  Defendant's decision not to substantially assist the United States, despite his attorney's work to make a possible reduction in sentence available on that basis, should not weigh as a factor in granting the motion.  In any event, the Fifth Circuit has held that an attorney providing incorrect advise about the likely sentence that a defendant discovers after reading a PSR is not a basis to find that he did not receive close counsel.  *See United States v. Dennis,* 631 Fed. Appx. 267, 267 (5th Cir. 2016).

In sum, this factor also weighs heavily against granting the motion.

### 6.  Knowing and Voluntary Plea of Guilty

"To enter a knowing and voluntary guilty plea, a defendant must have full knowledge of what the plea connoted and of its consequences."  *Lord,* 915 F.3d at 1016 (citing *Boykin v. Alabama*, 395 U.S. 238, 244)).  Additionally, the District Court must "determine that the factual conduct to which the defendant admits is sufficient as a matter of law to constitute a violation of the statute."  *Id.* (citing *United States v. Marek*, 238 F.3d 310, 314 (5th Cir. 2001).  It is well settled that "solemn declarations in open court carry a strong presumption of verity."  *United States v. Lampazianie,* 251 F.3d 519, 524 (5th Cir. 2001) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).  *See also Tollett v.*

*Henderson*, 411 U.S. 267 (1973) ("When [Defendant] solemnly admitted in open court that he is in fact guilty of the offense[s] with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.").

For Rule 11, making sure that a defendant understands "[t]he consequences of a guilty plea, with respect to sentencing, mean[s] only that the defendant must know the maximum prison term and fine for the offense charged." *United States v. Herrod,* 595 Fed. Appx. 402, 412 (5th Cir. 2015) (quoting *United States v. Rivera*, 898 F.2d 442, 447 (5th Cir. 1990)). "Thus, '[a]s long as the defendant understood the length of time he might possibly receive, he was fully aware of his plea's consequences.'" *Id.* (quoting *Rivera*, 898 F.2d at 447); *see also United States v. Rosales*, 281 Fed. Appx. 424, 425 (5th Cir. 2008) ("[B]ecause Rosales was aware of his minimum and maximum potential sentences and understood the elements of the offense as charged, he also has not established that his guilty plea was not knowing or voluntary.").

Additionally, for Rule 11, the Court must also "determine that the factual conduct to which the defendant admits is sufficient as a matter of law to constitute a violation of the statute.'" *Lord*, 915 F.3d at 1016 (quoting *United States v. Marek*, 238 F.3d 310, 314 (5th Cir. 2001)). "The district court must compare '(1) the conduct to which the defendant admits with (2) the elements of the offense charged in the indictment or information' to ensure that the defendant understands not only the nature of the charge but also that his conduct falls within the charge." *Id.* (quoting *Marek*, 238 F.3d at 315). *See also United States v. Castro-Trevino*, 464 F.3d 536, 540 (5th Cir. 2006) ("The factual basis for the guilty

plea must appear in the record ... and must be sufficiently specific to allow the court to determine that the defendant's conduct was within the ambit of that defined as criminal." "The underlying purpose of the rule 'is to protect a defendant who may plead with an understanding of the nature of the charge, but without realizing that his conduct does not actually fall within the definition of the crime charged.'" *Lord*, 915 F.3d at 1016 (quoting *United States v. Reasor*, 418 F.3d 466, 470 (5th Cir. 2005)).

Also for Rule 11, "[t]he defendant's declaration in open court that his plea is not the product of threats or coercion carries a strong presumption of veracity." *United States Clark*, 931 F.2d 292, 295 (5th Cir. 1991) (quoting *United States v. Darling*, 766 F.2d 1095, 1101 (7th Cir. 1985)). *See Herrod*, 595 Fed. Appx. at 412 (finding this factor weighed in the Government's favor because "although Herrod contends that his attorney pressured him into accepting a plea deal, Herrod affirmed under oath at his plea hearing that his plea was 'freely and voluntarily made' and that 'no one forced [him], threatened [him], or made any promises to [him]' to induce him to plead guilty." (citing *Clark*, 931 F.2d at 295)); *United States v. Lampazianie*, 251 F.3d 519, 524 (5th Cir. 2001) (noting that the "consequences of the plea were painstakingly explained to" defendant and that he "declared—under oath—in open court that he had not been threatened or coerced in any way, and that he was entering the plea voluntarily and fully informed"); *see also Clark*, 931 F.2d at 295 (upholding the lower court's denial of a motion to withdraw a guilty plea in part because the defendant "knew what was going on. He was an intelligent individual and had adequate counsel.").

In *United States v. Hughes,* No. 3:15-cr-11, 2016 WL 4527556 (S.D. Tex. Aug. 30,

2016), Judge Hanks explained that:

> [Rule 11] ensures that a guilty plea is "knowing and voluntary" by requiring the district court to follow certain procedures before accepting such a plea -- a district court must "inform the defendant of, and determine that the defendant understands . . . the right to plead not guilty." . . . The district court must also then "determine that the plea is voluntary." . . . To satisfy this obligation, the district court must conduct a colloquy and determine that "the defendant understands what he is admitting and what the consequences of that admission may be, as well as that what he is admitting constitutes the crime charged, and that his admission is voluntarily made." *United States v. Rodriguez-DeMaya,* 674 F.2d 1122, 1125-26 (5th Cir. 1982) (quoting *United States v. Dayton,* 604 F.2d 931, 943 (5th Cir. 1979)). . . . [T]he transcript reflects, [Defendant] was thoroughly apprised of exactly what he was admitting to and what his guilty plea meant. Before he entered his plea, [Defendant] . . . stated that he understood the charges against him; understood the elements of the offenses; had discussed the charges in detail with his attorney; and that he had in fact committed the offenses charged. Hughes has not identified any deviation from Rule 11. . . . *See United States v. Urias-Marrufo,* 744 F.3d 361, 366 (5th Cir. 2014) (noting that a plea is knowing and voluntary when the defendant has a full understanding of what the plea connotes and of its consequences).

*Id.* at *3-4.

In addition, in *Anderson*, 2021 WL 329896, at *3, that Court explained that, in a situation where "both parties thought the guideline range would be lower," withdrawal of a guilty plea was not warranted because, during the plea colloquy, the Court addressed the fact that the range is advisory, that the range and ultimate sentence could be higher than expected, that the defendant confirmed he intended to plead guilty knowing that the guideline and ultimate sentence could be very different from his attorney's and the Government's estimates, that the Court could impose a sentence more severe than the defendant anticipates, and the maximum sentence he faced.

Likewise, in *Jones*, 2021 WL 1320715, at *15-18, that Court explained that:

Here, throughout the arraignment, the Court explained in detail Defendant's rights and ensured his understanding of them, . . . and Defendant demonstrated throughout that hearing that his decision to plead guilty was made knowingly and voluntarily. . . .    Specifically, Defendant answered questions to establish his competence, . . . acknowledged that he read the . . . Information, that he understood it, and that [defense counsel] answered any questions he had, . . . [he] had the . . . Information read to him and said he understood it and the charges against him, . . . [he] discussed the . . . plea agreement at length, had key provisions read and summarized to him, and acknowledged that he understood those provisions and the entire agreement, . . . and engaged in a colloquy to demonstrate that all of his rights were voluntarily waived and not the results of threats, force, promises outside the plea agreement, or predictions about his sentence.  At the end of the hearing, Defendant specifically said he understood the consequences of his guilty plea, that he was pleading guilty because he was in fact guilt of the charges in the . . . Information, and that he was pleading guilty voluntarily and of his own free will.    Thus, the record clearly demonstrates that Defendant knowingly and voluntarily waived his rights.  The record also demonstrates that Defendant certainly understood the maximum and mandatory minimum penalties he faced. . . .    [C]ounsel for the Government summarized the superseding plea agreement, and she specifically noted how that agreement listed the maximum penalties and the mandatory minimums of the crimes to which Defendant was pleading guilty. . . .  Defendant specifically stated that he understood counsel's summary of the agreement and that it was consistent with his understanding of it. . . .    Later, the Court expressly explained to Defendant the maximum and minimum penalties for his crimes.  Defendant acknowledged understanding all of these penalties.  Indeed, . . . Defendant even demonstrated how closely he was paying attention by asking questions to the Court during this exchange.  And Defendant was explicitly asked if he "underst[ood] all of the consequences of [his] plea," and he said "Yes."  For all these reasons, Defendant was advised of the consequences of his plea. . . .  [Also,] [a]t the arraignment, counsel for the Government read a detailed factual basis to Defendant, after which Defendant stated under oath that he understood what counsel said and that that was what happened and what he did.  Later, Defendant again agreed that the factual basis was what happened and what he did.  The Court then reviewed each essential element of the offenses in the . . . Information, and Defendant admitted that this is in fact what he did.  Under these circumstances, the Court cannot say that the Defendant did not realize that his conduct fell within the definitions of the charged crimes. . . .  Considering Defendant's many declarations during the arraignment—from his understanding of the charges and penalties against him to his admissions that he did in fact commit each element of the charged crimes and statements about House—the Court finds that Defendant's guilty

plea was knowing and voluntary and that this factor weighs strongly in the Government's favor.

Here, the Court conducted a thorough and careful Rule 11 colloquy with Defendant at re-arraignment, allowed Defendant to confer with counsel, and made numerous inquiries ensuring that Defendant entered a knowing and voluntary plea. Indeed, the Court noted that the plea was onger and ore detailed than usual as the Defendant significantly interacted throughout. The Court also noted that Defendant "appeared to be a bright young man."

This factor also weighs heavily against withdrawal.

### 7. Waste of Judicial Resources

In *Jones,* 2021 WL 1320715, at *19-2-, that Court explained that:

> Here, as the Government asserted, allowing Defendant to withdraw his guilty plea after such a poor showing of the other factors . . . would be a considerable waste of the Court's resources. . . . Defendant argues that rejecting his request to withdraw the guilty plea will result in the use of more judicial resources in the form of an appeal and § 2255motion. But the Fifth Circuit rejected a similar argument in [*United States v. Herrod*, 595 Fed. Appx. 402, 411 (5th Cir. 2015)). . . . "Herrod's threat of future (possibly frivolous) filings is inapposite to whether allowing this case to go to trial will inconvenience the court or waste its resources.". . . The same reasoning applies here. The Court's decision on this motion is well grounded, and the threat of an appeal and future motions from Defendant on this issue does not justify the relief he seeks. Further, Defendant fails to take into account the resources which a ruling in his favor would entail, including (presumably) re-urged motions . . . (with the additional briefing, hearing, and rulings this will likely warrant), a trial (of unknown length), and a possible appeal anyway if Defendant is convicted (and potentially on more grounds, depending on the issues that arise at trial).

Generally speaking, the "Court is in the best position to know the effect that withdrawal has on its resources. *Lord*, 915 F.3d at 1017. However, the United Staes notes that granting Defendant's motion and holding a jury trial would waste judicial resources is

several ways.  The Court has already taken Defendant's plea, orders a PSR be created, the United States Probation Officers created and disclosed the PSR to all parties and responded to the parties' voluminous objections, and now the Court has stayed sentencing to allow this motion to resolve.  These delays will only be compounded were the Court to wait to hold a jury trial.  Furthermore, at a jury trial, the Court would be required to impanel a jury and would require testimony from federal agents, officials, co-defendants, confidential sources, and victims of sex trafficking.  Thus, this factor weighs heavily against withdrawal.

### B. Defendant's Stricken *Pro Se* Motion to Withdraw His Guilty Plea Fails to State a Claim

To the extent the Court desires the United States to address the claims in Defendant's *pro se* motion based on the allegations made by defense counsel, such claims are baseless.  First, Defendant claims that he was arrested on a criminal complaint.  *See* Doc. 634. However, as docket from the case establishes, that is simply untrue.  Instead, the case began with an indictment and no criminal complaint was ever filed.  Second, Defendant claimed that there was a communication issue with his attorney.  However, the Court held two hearings on those issues and concluded that those issues had been resolved.  Third, Defendant's claim about not being able to personally review discovery is misplaced as there is a Protective Order in this case barring just that.  Fourth, Defendant complains about being charged with sex trafficking of a minor.  However, Defendant was never charged with that offense.  Rather, that was a charge relating to other Defendants.  *See* Count Two of the Indictment at Doc. 1.  Defendant's Fifth and Sixth claims relate to his assertion that

the base offense level is being improperly calculated and his cursory claim that he was actually innocent.  These issue have already been addressed.  *See* fn. 2 and *Harrison,* 777 F.3d at 235.  As a result, Defendant's claims in his *pro se* motion, even if not stricken, are baseless.

### C. Defense Counsel's Claim About a 12 Year Recommendation are Preposterous

There are at least five separate and independent bases as to why this claim in defense counsel's filings and communications with the Court are nonsensical.

First, it must be remembered that in *Gonzalez,* defense counsel repeatedly made herself a witness and stated as both a witness and officer of the Court that the AUSA and Federal agents claims that that Defendant said he made 11-12 trips as opposed to 3-4 trips were lies and that she was present and witnessed that Defendant state he only made 3-4 trips.  The Court of course found the Federal agents credible and adopted a guideline recommendation requiring a finding of more than 4 trips.  Thus, by finding the Federal agents credible, it is axiomatic that defense counsel's claim that they were lying was found to be not credible.

After that, in *Mahan,* defense counsel similar claimed that the AUSA and Federal agents were lying when they stated the defendant made 3 total trips as opposed to 1 and that she was present and witnesses that Defendant state he only made 1 trip.  The Court of course found the Federal agents credible and adopted a guideline requiring a finding of 3 trips.  Thus, by finding the Federal agents credible, it is again, axiomatic that defense counsel's claim that they were lying was found to be not credible.

Similarly here, Defendant is continuing this course of conduct. As a result, this Court should, similar to Judge Hanen and Judge Harmon, reject defense counsel's contentions that the AUSA and/or Federal agents are lying and accordingly, find her claims to be false.

Second, pursuant to Rule 3.08(a) of the Texas Disciplinary Rules of Professional Conduct (which defense counsel has previously been informed of in one of those prior cases), the Court should reject outright defense counsel's claims because she is making herself a witness. Defense counsel has already been warned repeatedly by other Courts about this conduct and yet continues to engage in it.

Third, the thrust of defense counsel's claim is that she was going to ask for a sentence of 8 years imprisonment without application of U.S.S.G. § 5K1.1. However, as both she and Defendant acknowledged during the re-arraignment, and as the Court informed them, the mandatory minimum for Defendant's counts of conviction are ten years imprisonment. In other words, defense counsel's entire premise is that she would have knowingly asked this Court, as an Officer of the Court, to impose an illegal sentence.

Similarly related to the third problem is defense counsel's fourth problem, which is that the *pro se* motion to withdraw the guilty plea was already stricken when the alleged "12" was mentioned. Moreover, undersigned counsel had already successfully prevailed over a similar motion by co-defendant Maria Angelica Moreno-Reyna as both motions were filed *pro se* while they were represented by counsel. Also, as stated above, Defendant's *pro se* motion failed to state a claim. Yet to accept defense counsel's premise would require the Court to ignore all of those factors and believe that undersigned counsel

was so fearful of the stricken *pro se* motion that he made some fantastical statement. Indeed, in light of the fact that such a motion leads to a loss of credit for acceptance of responsibility (and thus a higher guideline sentence), the contention makes no sense.

Finally, defense counsel's claim throughout her filings and emails to the Court are inherently contradictory and also contradictory to the sworn plea allocution made by Defendant and to which she averred. Specifically, at the initial sentencing proceeding and in her motion, defense counsel claims that the "12" was stated regarding Defendant's stricken *pro se* motion to withdraw his plea of guilty. However, in her most recent email to the Court, she states repeatedly that it was made prior to the plea allocution. Additionally, the allegation would result in every statement made by Defendant at the plea allocution perjurious. Defense counsel's claim also overlooks the fact that the motion at issue had **already been stricken.**

As AUSA Casey MacDonald previously stated, "Ms. Pastorini's arguments are offensive. Her core argument is that [an AUSA] . . . .lied to your Honor. She claims that . . . The idea that agents would – and I would conspire to frame Mr. Mahan . . . it's absurd, and it is offensive. And I continue to object again, for the record, to Ms. Pastorini repeatedly trying to proffer evidence and testify as a witness without taking the stand, not being subject to cross-examination, and not being under oath." Undersigned counsel submits that Ms. MacDonald's statement is as true today as when it was made several years ago. As a result, the Court should give no credence to Ms. Patorini for her continued outrageous, offensive, and absurd conduct.

## IV.    CONCLUSION

For the abovementioned reasons, Defendant's motion should be denied, he should not be awarded acceptance of responsibility, and should he adopt his counsel's contentions, he should receive an enhancement for obstruction of justice.

Date:  February 24, 2026          Respectfully submitted,

NICHOLAS J. GANJEI
United States Attorney, Southern District of Texas

By:    *s/ Adam Laurence Goldman*
       Adam Laurence Goldman
       Assistant United States Attorney
       Attorney-in-Charge
       S.D. Tex. ID No.: 1034195
       State Bar Nos.: NY3038023/DC476521
       1000 Louisiana Street, 24th Floor
       Houston, Texas 77002
       Tel.:713-567-9534; FAX:713-718-3303
       E-mail:  Adam.Goldman2@usdoj.gov
       *Counsel for the United States of America*

### CERTIFICATE OF SERVICE

I FURTHER HEREBY CERTIFY that on this 24th day of February, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, to which opposing counsel listed below is a member and provided a copy via email:

Winifred Akins Pastorini
440 Louisiana Street, Suite 200
Houston, Texas 77002
Tel.:  713-236-7300
Email: windi@pastorinilaw.com

       *s/ Adam Laurence Goldman*
       Adam Laurence Goldman, Asst. U.S. Atty.